Patrice L. Bishop (SBN 182256)
Timothy J. Burke (SBN 181866)
service@ssbla.com
STULL, STULL & BRODY
10940 Wilshire Boulevard
Suite 2300
Los Angeles, CA 90024
Tel:    (310) 209-2468
Fax:    (310) 209-2087

**Counsel for Plaintiff**

FILED

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

2009 OCT 13  PM 2: 16

BY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV09-7400 MAN

THOMAS SHOTKE, Individually
and on Behalf of all Others Similarly
Situated,

      Plaintiff,

    v.

PACIFIC CAPITAL BANCORP,
GEORGE LEIS, DAVID PORTER,
and SANDLER O'NEILL &
PARTNERS L.P.,

      Defendants.

CASE NO.

**CLASS ACTION**

**COMPLAINT FOR VIOLATION
OF FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

Z:\STULL\PACIFIC CAPITAL\PLD\Shotke Complaint.wpd

1    Plaintiff Thomas Shotke, by his undersigned attorneys, alleges the following

2    upon knowledge as to his own acts and upon information and belief as to all other

3    matters based upon the investigation made by and through his attorneys, which

4    investigation included, *inter alia,* a review of Securities and Exchange Commission

5    ("SEC") filings, press releases, analyst reports, news articles and/or other materials.

6                            **<u>NATURE OF THE ACTION</u>**

7        1.    This is a stockholder class action brought by plaintiff on behalf of

8    himself and all purchasers of Pacific Capital Bancorp ("PCBC" or the "Company")

9    common stock during the period April 30, 2009, when the Company issued its first

10   quarter 2009 financial results and announced that it was maintaining a strong

11   allowance for loan losses which would enable the Company to absorb losses in the

12   portfolio as the recession continues, through July 30, 2009, when the Company

13   reported an additional loan loss provision of $117 million, a goodwill charge of

14   $128.7 million, and a quarterly net loss of $362.6 million. The action seeks to pursue

15   remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against

16   PCBC and certain of its executive officers (collectively, the "PCBC Defendants"),

17   and Sandler O'Neill & Partners L.P. ("Sandler O'Neill").

18       2.    Throughout the Class Period, the PCBC Defendants knowingly or

19   recklessly led the market to believe that the Company's loan loss provision was being

20   maintained at a very high level and would enable the Company to absorb future

21   losses, when, in fact, defendants knew or recklessly failed to know that the loan loss

22   provision taken in the first quarter 2009 was wholly inadequate to meet the

23   Company's exposure to asset deterioration losses, and that the Company did not

24   adopt a conservative reserve methodology until July 30, 2009. The Sandler O'Neill

25   comments raising their rating from "Hold" to "Buy" reinforced the impression that

26   the Company was adequately reserved for loan losses.

27       3.    As the truth about the Company's exposure became known to the

28   market, the price of the Company's common stock declined from a closing price of

                                       2

$6.94 on April 30, 2009, to a closing price of $2.12 on July 31, 2009, the day after the truth about the Company's risk was confirmed. As a consequence of the artificially inflated price of PCBC common stock during the Class Period, investors who purchased shares at artificially inflated prices suffered damages.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

5. This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated under § 10(b) by the SEC, 17 C.F.R. § 240.10b-5.

6. Venue is proper in this District pursuant to § 27 of the Exchange Act, and 28 U.S.C. § 1391(b), because many of the acts, conduct, and other wrongs charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendant PCBC maintains its principal executive offices in this District.

7. In connection with the acts, conduct, and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of national securities markets.

## PARTIES

8. Plaintiff, Thomas Shotke, purchased PCBC common stock at artificially inflated prices during the Class Period, as set forth in the accompanying certification and was damaged thereby.

9. Defendant PCBC is a bank holding company organized and existing under the laws of the State of California, with its principal executive offices located at 1021 Anacapa Street, Santa Barbara, California. PCBC is and at all times relevant hereto was listed and traded on the NASDAQ securities exchange under the symbol "PCBC". PCBC is the parent company of Pacific Capital Bank, N.A., a nationally

3

chartered bank that operates 46 branches under the local brand names of Santa Barbara Bank & Trust, First National Bank of Central California, South Valley National Bank, San Benito Bank and First Bank of San Luis Obispo.

10.     Defendant George Leis ("Leis") has been at all times relevant hereto the President, Chief Executive Officer and Chief Information Officer of PCBC.

11.     Defendant David Porter ("Porter") has been at all times relevant hereto the Chief Credit Officer of PCBC.

12.     The defendants named above in ¶¶ 10 - 11 are sometimes collectively referred to herein as the "Individual Defendants."

13.     The Individual Defendants and defendant PCBC are sometimes collectively referred to herein as the "PCBC Defendants."

14.     Defendant Sandler O'Neill & Partners L.P. ("Sandler O'Neill") has, at all times relevant hereto provided analyst coverage and issued analyst reports and ratings relating to PCBC.  Sandler O'Neill is a privately-held firm, which describes its core practice areas as investment banking, capital markets, fixed income/balance sheet management, equity research, equity trading and sales, and mortgage finance.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action on his own behalf and as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of all purchasers of PCBC common stock during the Class Period who suffered damages as a result of those transactions (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants.

16.     This action is properly maintainable as a class action.

17.     The members of the Class are so numerous that joinder of all members is impracticable.  According to PCBC's SEC filings, as of April 30, 2009, there were 46,682,465 shares of PCBC common stock outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained

4

through appropriate discovery, plaintiff believes there are hundreds if not thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by PCBC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.    Plaintiff's claims are typical of the other members of the proposed Class, as all Class members are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

19.    The disposition of Class members' claims in a class action will be of benefit to the parties and the Court.

20.    There is a well-defined community of interest in the questions of law and fact involved affecting the members of the Class. Among the questions of law and fact which are common among the members of the Class, which predominate over questions affecting any individual Class member, are *inter alia,* the following:

(a)    whether certain documents filed by the Company with the SEC contain materially false and misleading statements, in violation of Section 10(b) of the Exchange Act;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, finances and/or outlook of PCBC; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

21.    Plaintiff is a member of the Class and is committed to prosecuting this action. Plaintiff has retained competent counsel experienced in class and securities litigation of this nature. The claims of the plaintiff are typical of the claims of the other members of the Class, and plaintiff has the same interests as the other members of the Class. Plaintiff does not have interests antagonistic to or in conflict with those

5

1  he seeks to represent. Plaintiff is therefore an adequate representative of the Class

2  who will fairly and adequately protect the interests of the members of the Class.

3      22.    A class action is superior to all other methods for the fair and efficient

4  adjudication of the claims herein asserted. The likelihood of individual Class

5  members prosecuting separate individual actions is remote due to the relatively small

6  loss suffered by each class member as compared to the burden and expense of

7  prosecuting litigation of this nature and magnitude. Absent a class action, defendants

8  are likely to avoid liability for their wrongdoing, and class members are unlikely to

9  obtain redress for their wrongs alleged herein. There are no difficulties likely to be

10  encountered in the management of the Class claims. This Court is an appropriate

11  forum for this dispute.

12                    **SUBSTANTIVE ALLEGATIONS**

13      23.    On April 30, 2009, the Company filed Form 8-K with the SEC

14  announcing that on that date the Company issued a press release announcing financial

15  results for the quarter ended March 31, 2009. A copy of that press release was filed

16  with SEC as Exhibit 99.1 to the Form 8-K filed by the Company on that date.

17      24.    The Company's April 30, 2009 Form 8-K and press release announcing

18  financial results for the quarter ended March 31, 2009 reported a net loss for the first

19  quarter of $7.9 million, or ($0.17) per share. According to the April 30, 2009 press

20  release, "[t]he pretax loss generated by the Core Bank in the first quarter of 2009 was

21  primarily a continuation of the trends experienced throughout 2008, including

22  elevated charge-offs in the residential construction loan portfolio and a compression

23  in net interest margin."

24      25.    The Company's April 30, 2009 press release also reported that

25  "[f]inancial results for the first quarter 2009 include a provision for loan losses in the

26  Core Bank of $73.5 million. . . [which] increases the Company's allowance for loan

27  losses in the Core Bank to $141.0 million, or 2.48% of total loans, at March 31,

28  2009."

6

26. The Company's April 30, 2009 press release included comments by defendant Leis, stating, *"We continue to maintain a strong allowance for loan losses, which we believe will enable us to absorb losses in the portfolio as the recession continues."* (Emphasis added.)

27. The Company's April 30, 2009 press release also addressed the Company's "Asset Quality", reporting several steps taken to address loan risk and exposure as follows:

> While the balance of this portfolio has dropped to $198 million at March 31, 2009, from $274 million at March 31, 2008, the Company has taken several measures to mitigate the risk going forward, including:
>
> • the addition of seven full-time positions to Credit Administration as asset managers dealing with problem loans;
>
> • a reduction in hold limits on all loan types to reduce size concentrations;
>
> • a reduction in total commercial real estate concentration limits to below 300% of capital;
>
> • restricting residential construction underwriting to the Company Real Estate Industries Group;
>
> • disallowing any construction lending outside of the Company's footprint; and
>
> • establishing a Board of Directors-level loan committee to oversee concentrations and problem loan resolution, among other responsibilities.

28. Also on April 30, 2009, the Company conducted a conference call with analysts during which the Company reiterated many of the statements contained in the Company's April 30, 2009 Form 8-K and press release. For example, during the April 30, 2009 analyst conference call defendant Leis stated that *"[t]he deterioration occurred in loans that were already in the non-performing category entering the*

*quater.* [And that], *[w]e did not see any meaningful new inflows of residential construction loans into non-performing this quarter."* (Emphasis added.)

29. Defendant Leis further stated during the April 30, 2009 conference call with analysts that "[t]he provision we recorded this quarter has kept our core bank allowance for loan losses at *a very high level.* At March 31, 2009 our allowance represented 2.48% of total loan [sic] [and] approximately 90% of our allowance is allocated to loans that are not currently impaired which we believe *positions us well to [absorb] [sic: observe] the inherent losses in the portfolio.*" (Emphasis added.)

30. The Company's April 30, 2009 conference call with analysts also included comments, among others, by defendant Porter, in response to the following question from defendant Leis:

> *George Leis:* Dave, that portfolio that residential home builder portfolio has been reviewed, examined and pretty much entirely classified. Right?
>
> *Dave Porter:* I mean – obviously with what's happened there with the industry, *we have looked at that very closely with the regulators,* with our home loan review and the marks we have taken now are very current marks and hopefully going forward we won't see the same deterioration particularly after you have had a significant write down on some of these assets.

(Emphasis added.)

31. The Company's April 30, 2009 conference call with analysts also included comments, among others, by defendant Porter, in response to the following question from the Company's Chief Financial Officer, Steven Masterson:

> *Steven Masterson:* And, Dave, do we have a handful of large loans and granularity – *that concentration doesn't exist in the remaining part of the portfolio,* it's a little more granular whether its not be [sic] –
>
> *Dave Porter: Yes, exactly.* I think we saw three or four large accounts in the fourth quarter, similarly in the first quarter, three or four large

8

1   accounts that made up the majority of the mark downs.  And we just are

2   not seeing that opportunity to do that in this portfolio going forward yet.

3   *Steven Masterson:* Thank goodness.

4   *Dave Porter:* Thank goodness, yes.

5   (Emphasis added.)

6          32.     The Company's April 30, 2009 conference call with analysts also

7   included comments, among others, by defendant Leis, in response to the following

8   question from an analyst concerning commercial real estate delinquency data:

9          *Analyst:* Before I step back, I just wanted to get your sense on a few

10         follow up questions to that.  Looking at your delinquency data, your

11         CRE delinquencies seems to be just kind of slowly growing.  I was

12         wondering what you are observing in the market as to what's going on

13         and what your sense is, how it's going to perform in about a year as

14         market participants.  And the second thing is while there was definitely a

15         big spike in the early delinquencies in that third quarter in construction

16         which you are clearly working through and marking down as you need,

17         can you talk about your ability to sell your non-performing loan or

18         resolve your non-performing loans because that level is growing?  Bust

19         also *because your early stage delinquency number looks like it's sitting*

20         *fairly steady.*  So like what are the new construction loans are starting to

21         trickle in there.  In mean the rate of change is slow but there is still some

22         growth right?

23         *George Leis:* Yes.  Actually it looks like our delinquency and then

24         looking at construction *it's actually come down a little bit from fourth*

25         *quarter.*  And then on our non-performing loans on construction that's

26         also come down if you look at the table on page 15.

27         *Analyst:* Yes, I looked at that and so it looks like the 30 to 89's migrated

28         into NPL's, right?  But then there is still like a base line level of 30 to

9

89's still sitting there.  I was wondering are those new loans?  *Are they like ones from before?  Like what new weaknesses are you seeing in construction if any?*  Like some other banks have condos start popping up and things like that?

*George Leis:* I can't say it's been new.  This portfolio has been a problem I think starting in the first quarter of 2008 for us.  So, I am *not sure we are seeing a lot of new activity come into that portfolio this quarter,* Juliana.

*Analyst:* Right.

*George Leis:* Your question around the commercial real estate delinquency, *we are watching that very closely obviously, but we have not seen the delinquency metrics really be too negative at this point.  I thing it's been relatively manageable.*

(Emphasis added.)

33.     The Company's April 30, 2009 conference call with analysts also included comments, among others, by the Company's Chief Financial Officer Steven Masterson in which he stated, in discussing the Company's staff reductions, that "[t]he one area that has been largely unaffected is the credit administration group where we have in fact added personnel to manage mediation of our troubled assets."

34.     On May 11, 2009, the Company filed Form 10-Q with the SEC containing the Company's financial results for the quarter ended March 31, 2009, signed by defendant Leis.  The Company's first quarter Form 10-Q described, among other things, the Company's opinion of the loan loss provision as follows:

Management believes that the continued increase in [allowance for loan losses] will better position the Company to manage anticipated loan losses throughout the forecasted prolonged economic downturn impacting all of the Company's loan portfolios.

35. On June 17, 2009, Sandler O'Neill upgraded PCBC's common stock from "Hold" to "Buy."

36. Just five days after the upgrade, on June 22, 2009 the Company filed Form 8-K with the SEC, announcing that the Company has deferred regularly scheduled interest payments on its outstanding $69.4 million of junior subordinated notes relating to its trust preferred securities, and that the Company has likewise suspended the payment of dividends on its common and preferred stock. The June 22, 2009 Form 8-K also stated that, on that date, the Company issued a press release, which was also filed with the SEC on that date as Exhibit 99.1 to that Form 8-K, announcing its deferral of interest on the junior subordinated notes and suspension of cash dividends on its outstanding common stock and preferred stock.

37. The Company's June 22, 2009 Form 8-K Exhibit 99.1 / press release also included comments by defendant Leis, stating that "[m]aintaining strong capital ratios is essential for ensuring the health of the Bank during these difficult economic times and is in the best long-term interest of all of our shareholders." Further, defendant Leis stated that "[w]e believe the actions we have announced today are the most prudent course of action and will improve our flexibility to consider other actions that may need to be taken in order to achieve our targeted capital ratios."

38. As reported in *The Santa Barbara Daily Sound* on September 9, 2009, PCBC received Troubled Asset Recovery Program, or TARP, funds from the U.S. Treasury in November 2008 and PCBC's June 22, 2009 dividend suspension also applied to the government, which, according to the article, extended a $180.6 million loan to the bank under the TARP Capital Purchase Plan. The article also noted that defendant "Leis and other bank officials refuted the notion from some financial bloggers and analysts that they are in trouble."

39. As reported in *Vanity Fair* in October 2009, "in a conference call with analysts on November 21 [2008], Stephen Masterson, the chief financial officer of Pacific Capital Bancorp, admitted that TARP 'obviously helps us. . . . We didn't take

11

the TARP money to increase our RAL program or to build our RAL program, but it certainly helps our capital ratios.'" According to the article, RALs are taxpayer refund-anticipation loans, which are "high-interest loans to the poor that are among the most predatory around." The October 2009 *Vanity Fair* article also reported that, "[a]s of [that] writing, some banks, including Pacific Capital Bancorp, . . . have not been able to make their scheduled [TARP] payments."

40.    The Company's stock price declined upon the Company's June 22, 2009 announcement, falling from a closing price of $3.31 per share on June 22, 2009, to a closing price of $2.65 per share on June 23, 2009. The Company's stock price continued to decline through the remainder of that week, to close at $2.26 per share on Friday June 26, 2009.

41.    A news article published on June 27, 2009 by *The Associated Press,* authored by that agency's national business columnist Rachel Beck and headlined *"Investors' tools to understand banks"*, reported as follows:

> The timing of the announcement [of suspension of dividend payments] was tied to the fact that the interest payments on certain types of its preferred securities were due and the bank needed to notify the people who held them that it was deferring the payments and couldn't pay any dividends, according to Pacific Capital spokeswoman Debbie Whiteley.

> That will save the bank about $8 million per quarter . . . but investors weren't impressed. The stock has fallen more than 25 percent since the dividend suspension was announced to around $2.50 per share.

42.    The June 27, 2009 *Associated Press* article also reported on an interview that had been conducted between the Company's management and Aaron James Deer, the Sandler O'Neill analyst who only a few days earlier had issued a "Buy" recommendation on Pacific Capital stock. The interview demonstrated the recklessness of Sandler O'Neill in issuing a statement to the market that contained a

"Buy" recommendation on Pacific Capital stock despite the fact that, if prior to the rating upgrade, it had conducted the kinds of analyses that analysts typically -- and admittedly -- perform in assessing the financial condition of a bank, they would have understood that Pacific Capital was not, at that time, a good investment. While it would not have been expected that the "reasonable investor" would have had the know-how or sophistication to perform the kind of analyses that Deer admitted he should have performed, there was no excuse for Deer's reckless failure to perform such analyses and to not issue a "Buy" recommendation unless the results of the analyses supported such a recommendation and continuation of the payment of dividends. Deer acknowledged in an interview that his upgrade was the wrong call. But in doing, so, he also reminded himself of the regulatory rule he should have been watching: Bank dividends are imperiled if the payouts are more than the banks have cumulatively earned over the last two years.

> Deer estimates Pacific Coast lost about $19 million between the third quarter of 2007 and the second quarter of this year. He forecasts Pacific Capital's losses for all of this year will total $25.75 million in 2009, on top of a loss of $23.84 million in 2008.

> "Honestly, I had not reviewed the earnings progression and considered how that would affect their ability to pay dividends," Deer said.

43. Deer clearly had access to all the information he needed to make a reasonable recommendation or to refrain from issuing a recommendation. According to the June 27, 2009 *Associated Press* article, Deer met with PCBC's management a week before issuing his upgrade.

44. On July 30, 2009, the Company filed Form 8-K with the SEC, announcing that, on that date, the PCBC issued a press release announcing financial results for the quarter ended June 30, 2009. The press release issued by the Company

13

1  on July 30, 2009 was also filed with the SEC, as Exhibit 99.1 to the Company's July

2  30, 2009 Form 8-K.

3       45.    The Company's July 30, 2009 Form 8-K and press release announced

4  that PCBC experienced a second quarter 2009 net loss of $362.6 million, or ($7.77)

5  per share, compared to a net loss of $5.9 million, or ($0.13) per common share, in the

6  second quarter of 2008.

7       46.    Included in the Company's second quarter 2009 financial results was a

8  disclosure that the Company recorded a provision for loan losses of $194.1 million

9  for the second quarter 2009, which, according to the disclosure, "increase[d] the

10  Company's allowance for loan losses in the Core Bank by $117 million", and that

11  "[a]t June 30, 2009, the allowance was $258.0 million, or 4.57% of total loans and

12  80% of non-performing loans."  The Company also disclosed a "$128.7 million non-

13  cash charge to reflect an impairment of goodwill."

14       47.    According to the July 30, 2009 Form 8-K and press release, the $194.1

15  million second quarter 2009 provision for loan losses included the following

16  components:

17            1.    $77.1 million to cover net charge-offs in the Core Bank, of

18       which approximately $30.1 million related to the residential construction

19       portfolio and $27.0 million related to the commercial and industrial

20       portfolio; and

21            2.    $117.0 million added to the allowance for loan losses in the

22       Core Bank to reflect in increase in problem loans and higher loss rates in

23       recent quarters.

24       48.    The Company's July 30, 2009 Form 8-K and press release provided the

25  following additional disclosures concerning the $194.1 million loan loss provision:

26            The increase to the allowance for loan losses was directionally

27       consistent with the recent elevated credit losses experienced by the

28       Company.  Further, in recognition of these recent credit losses and the

14

continued deterioration of the general economic environment, the
Company shortened the timeframe utilized for estimating historical loss
rates in its calculations of the FAS 5 component of the allowance (i.e.,
reserve for non-impaired loans calculated on a loan pool basis). The
shortened timeframe placed more weight on the recent history of
increased losses, which resulted in a substantial increase in the
allowance.

Total non-performing assets were $348.3 million at June 30, 2009,
compared to $271.1 million at March 31, 2009. The increase in non-
performing assets is primarily attributable to deterioration in the
commercial real estate and construction portfolios.

Approximately 27% of the Bank's total non-performing assets at
June 30, 2009 were still current on interest and principal payments.
These credits have been placed on non-performing status due to
identification of some form of impairment, such as a decline in collateral
value. In such cases, the Bank has established a specific allowance
against these impairments. If these borrowers continue to demonstrate
the ability to service their debt according to the agreed upon terms, the
loans could be moved back to performing status in future quarters.

49. Comparative asset quality data for the first and second quarters of 2009
set forth in the Company's July 30, 2009 Form 8-K and press release, include the
following:

| (Dollars in Millions) | March 30, 2009 | June 30, 2009 |
|---|---|---|
| Allowance for loan losses | $141.0 | $258.0 |
| Allowance for loan losses / total loans | 2.48% | 4.57% |
| Total non-performing assets | $271.1 | $348.3 |
| Total non-performing assets / total assets | 3.41% | 5.00% |
| Allowance to non-performing loans | 54% | 80% |

15

1    50.    The Company's July 30, 2009 Form 8-K and press release also contained

2    comments by defendant Leis, as follows:

3              "[G]iven the ongoing weakness in the California economy and

4         housing market, we have substantially strengthened our allowance for

5         loan losses.  As a result of this build in reserves, our allowance for loan

6         losses increased to 4.57% of total loans and 80% of total non-performing

7         loans in the Core Bank at June 30, 2009.  While the increase in

8         allowance for loan losses had a negative impact on our second quarter

9         results, we believe the higher level of allowance will benefit the

10        Company going forward as we continue to manage through the credit

11        cycle."

12    51.    The Company's July 30, 2009 Form 8-K and press release also disclosed

13    that the Company retained Sandler O'Neill & Partners, L.P., the analyst defendant

14    herein, which had only weeks before issued a "Buy" recommendation, to serve as a

15    financial advisor to the Company in connection with a process initiated by the

16    Company's Board of Directors to identify and evaluate a broad range of strategic

17    alternatives to further strengthen the Company's capital based and enhance

18    shareholder value.

19    52.    A news article relating to the Company's second quarter results was

20    published on July 30, 2009 over Comtex News Network by Midnight Trader,

21    headlined *Pacific Capital Bancorp Slides 15%, Reports Q2 Loss and Says Looking*

22    *at Strategic Options*.  According to that article:

23              Pacific Capital Bancorp (PCBC) says it lost $4.46 per share in Q2,

24        less items.  The Thomson Reuters estimates for a $0.33 per share loss.

25        Its allowance for loan losses increased to 4.57% of total loans and 80%

26        of total non-performing loans in the Core Bank at June 30.  It says its

27        Tier 1 leverage ratio was not sufficient to meet the higher level that the

28        Bank has agreed with the Office of the Comptroller of the Currency to

16

maintain.  The Board has initiated a process to identify and evaluate a

broad range of strategic alternatives to further strengthen the Bank's

capital base and enhance shareholder value.  As part of this process, the

Board has retained Sandler O'Neill & Partners, L.P. to serve as a

financial advisor.

53.     During the Company's July 30, 2009 second quarter earnings conference

call with analysts, defendant Leis indicated that the Company was faced with the

same issues that it had been facing for some time and made the following statements,

among others:

The drivers of our elevated credit costs continue to be the same

issues that we have discussed in previous quarters.  Approximately 39%

of the net charge-offs in the second quarter occurred within our

residential construction portfolio of [sic] the value of the collateral

underlying these loans continue to decline.

Another 35% of the net charge-offs came from CNI loans,

including some businesses that are related to the residential construction

industry.  A large provision we recorded this quarter is partially

attributable to a change in the methodology that we use to calculate our

general reserve for the FAB [sic] five component of the allowance for

loan losses.

In recognition of the dramatic change in the economic conditions

that has taken place over the past 2 years, we significantly shortened the

time frame that is utilized for estimating historical loss rates from the 7

year period that we have typically used.  The shortened time frame had

the effect of giving more weight to recent quarters in which loss rates

have been higher.

As a result we added approximately $88 million more to the

general reserve this quarter then [sic] we would have under the more

17

elongated time frame. This is a more conservative methodology that we believe is appropriate in the current economic environment.

54.     During the July 30, 2009 conference call, the Company's Chief Financial Officer Stephen Masterson responded to a question from an analyst from Sandler O'Neill, asking for "a breakout to the allocation for the reserves between the specific reserves and general", as follows: "[S]pecific reserves are associated with our FAS 114 portfolio and they were approximately $16 million for the second quarter. The balance would be associated with the FAS 5 and qualitative factors."

55.     In reaction to the Company's July 30, 2009 disclosures, the price of the Company's common stock fell, from closing at $2.6 on July 29, 2009, to $2.26 on July 30, 2009, to $2.12 on July 31, 2009, representing a decline of approximately 19.5%. At the start of the Class Period, on April 30, 2009, the price of the Company's common stock closed at $6.94 per share, representing a Class Period decline in value of 67.44%.

56.     The artificial inflation which was removed from the price of the Company's stock on July 30, 2009, commenced on April 30, 2009, when the stock traded as high as $7.62 and closed at $6.94 per share, upon the Company's first quarter earnings announcement which assured investors that the Company's was maintaining a strong allowance for loan losses which would enable the Company to absorb losses in the portfolio as the recession continues. Contrary to the Company's statements on April 30, including the assurance that the Company's allowance for loan losses was at a very high level, the July 30 announcement revealed to investors that the Company had not adequately reserved for loan losses and, in fact, had not even applied a conservative methodology by which to do so.

57.     The following day, on July 31, 2009, Sandler O'Neill reversed its June 17, 2009 upgrade of PCBC common stock, and downgraded PCBC common stock from "Buy" to "Hold."

18

58.     A news article relating to the Company's second quarter results published by *American Banker* on July 31, 2009, by Marissa Fajt, headlined *"Calif. Bank Weighs Options After It Loses $360M in 2Q",* stated that "[t]he $7.3 billion-asset company said its net loss ballooned to $360 million in the second quarter, from $5.9 million a year earlier.  The second-quarter loss was largely due to a $194 million loan-loss provision and a $129 million goodwill charge."

59.     The statements contained above in ¶¶ 26-34, were each materially false or misleading when issued because those assurances to investors that the Company was adequately reserved were belied by the Company's admission on July 30, 2009 that the Company's reserves were not conservatively determined prior to that time and were, in fact, wholly inadequate to meet its exposure needs.

60.     The PCBC Defendants' statements contained in ¶ 26 above were materially false and misleading because, as would be disclosed on July 30, 2009, the Company's loan loss provision in the first quarter was not a *"strong allowance"* and would not *"enable [the Company] to absorb losses in the portfolio as the recession continues",* contrary to the Company's statements on April 30, 2009.

61.     The PCBC Defendants' statements contained in ¶ 27 above were materially false and misleading because, as would be disclosed on July 30, 2009, the measures announced by the Company on April 30, 2009 were not sufficient to *"mitigate the risk going forward"*.

62.     The PCBC Defendants' statements contained in ¶ 28 above were materially false and misleading because, as would be disclosed on July 30, 2009, the Company did in fact have *"meaningful new inflows of residential construction loans [moving] into non-performing"* in the second quarter.  This, in combination with the additional statement on April 30, 2009 set forth in ¶ 28, that *"[t]he deterioration occurred in loans that were already in the non-performing category entering the quarter"* told investors that new inflows were unlikely in the second quarter.

19

63. The PCBC Defendants' statements contained in ¶ 29 above were materially false and misleading because, as would be disclosed on July 30, 2009, the first quarter loan loss provision was not, in fact, *"at a very high level"* and would not *"position[] [the Company] well to [absorb] [sic: observe] the inherent losses in the portfolio."* In fact, the PCBC Defendants admitted that the first quarter provision was not at a very high level because it was not until the end of the second quarter that PCBC changed to a method that the PCBC Defendants called conservative.

64. The Company admitted on July 30, 2009 that prior to that point, contrary to the impression given to investors, the Company had not applied a conservative reserve methodology.

65. The PCBC Defendants' statements contained in ¶ 30 above were materially false and misleading because, as would be disclosed on July 30, 2009, the first quarter loss provision was not sufficient to render second quarter portfolio exposures *"entirely classified."*

66. Sandler O'Neill's statements, referred to in ¶ 35 as the June 17, 2009 rating upgrade, were materially false and misleading because, as was reported on June 27, 2009, the analyst had as of June 27, 2009 already acknowledged that his upgrade was "wrong" and, "in doing so, he also reminded himself of the regulatory rule he should have been watching…."

67. Sandler O'Neill's failure to reverse the upgrade for more than a month after it was acknowledged to be "wrong" was also materially false and misleading because it knowingly carried forward an ongoing falsehood.

68. The PCBC Defendants acted with scienter in that the PCBC defendants knew or recklessly disregarded the fact that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading. Defendants knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public and they substantially participated or acquiesced in the issuance or dissemination of such

20

statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding PCBC, their control over, and/or receipt and/or modification of defendants' materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning PCBC, participated in the fraudulent scheme alleged herein.

69.    The sheer magnitude of the second quarter loan loss provision also demonstrates *scienter* on the part of the PCBC Defendants. Compared to the additional first quarter provision of $73.5 million (for a total provision of $141 million), the additional second quarter loan loss provision of $117 million (for a total provision of $258 million at June 30, 2009), represented more than double the Company's net interest income for the second quarter of 2009 of $53.4 million.

70.    *Scienter* on the part of Sandler O'Neill in issuing a June 17, 2009 rating upgrade is demonstrated by the fact that the analyst admitted that there were certain simple calculations and regulatory rules that could have been utilized to foresee the Company's difficulties, thus demonstrating that they were acting with reckless disregard for the truth.

71.    *Scienter* on the part of Sandler O'Neill in failing to correct the June 17, 2009 rating upgrade is demonstrated by an *Associated Press* news article of June 27, 2009, which reported that the analyst admitted during an interview that the upgrade was "wrong", yet Sandler O'Neill did not reverse the upgrade for more than 4 weeks thereafter. The implication from the meeting reported to have taken place a week before the rating upgrade added to its authoritative profile.

72.    *Scienter* on the part of Sandler O'Neill is also demonstrated by the fact it benefitted from its false or reckless statements about PCBC common stock, as it was retained by the Company by the end of the Class Period to serve as financial advisor in connection with a process initiated by the Company's board of directors to identify and evaluate a broad range of strategic alternatives.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**

**FRAUD-ON-THE-MARKET DOCTRINE**

73.     At all relevant times, the market for PCBC's stock was an efficient market for the following reasons, among others:

(a)     PCBC's stock met the requirements for listing, and was listed and actively traded on the Nasdaq exchange, a highly efficient and automated market;

(b)     As a regulated issuer, PCBC filed periodic public reports with the SEC and the Nasdaq;

(c)     PCBC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     PCBC was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the salesforce and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

74.     As a result of the foregoing, the market for PCBC's stock promptly digested current information regarding PCBC from all publicly available sources and reflected such information in PCBC's stock price. Under these circumstances, all purchasers of PCBC's common stock during the Class Period suffered similar injury through their purchase of PCBC's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

75.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. Moreover, the specific statements

pleaded herein related to then-existing conditions. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5

### Against the PCBC Defendants

76. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77. During the Class Period, PCBC and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of PCBC's common stock; and (c); cause plaintiff and the other members of the Class to purchase PCBC's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

78. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for

23

PCBC's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

79. In addition to the duties of full disclosure imposed on defendants as a result of their affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, the PCBC Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

80. PCBC and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of PCBC as specified herein.

81. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) each of these defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and

information about the Company's finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

82.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PCBC's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

83.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PCBC's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of PCBC's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class purchased PCBC common stock during the Class Period at artificially high prices and were damaged thereby by virtue of the plaintiff and the other class

members having bought PCBC stock at inflated prices and continuing to hold that stock as the market began to learn the truth and the inflation began to dissipate from the PCBC stock price.

84.     At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of PCBC, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their PCBC common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

85.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

86.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**SECOND CLAIM**

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**

**Against Sandler O'Neill**

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.     During the Class Period, Sandler O'Neill carried out a course of conduct which, throughout the Class Period, did: (a) deceive the investing public, including plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of PCBC's common stock; and (c); cause plaintiff and the other members of the Class to purchase PCBC's common stock at artificially inflated

26

1  prices.  In furtherance of this course of conduct Sandler O'Neill took the actions set

2  forth herein.

3      89.    Defendants (a) employed devices, schemes, and artifices to defraud;

4  (b) made untrue statements of material fact and/or omitted to state material facts

5  necessary to make the statements not misleading; and (c) engaged in acts, practices,

6  and a course of business which operated as a fraud and deceit upon the purchasers of

7  the Company's securities in an effort to maintain artificially high market prices for

8  PCBC's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

9  All defendants are sued as primary participants in the wrongful and illegal conduct

10  charged herein.

11      90.    In addition to the duties of full disclosure imposed on defendants as a

12  result of their affirmative statements and reports, or participation in the making of

13  affirmative statements and reports to the investing public, the Sandler O'Neill had a

14  duty to promptly disseminate truthful information that would be material to investors

15  in compliance with the integrated disclosure provisions of the SEC as embodied in

16  SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17

17  C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and

18  truthful information with respect to the Company's operations, financial condition and

19  earnings so that the market price of the Company's securities would be based on

20  truthful, complete and accurate information.

21      91.    Sandler O'Neill, directly and indirectly, by the use, means or

22  instrumentalities of interstate commerce and/or of the mails, engaged and participated

23  in a continuous course of conduct to conceal adverse material information about the

24  business, operations and future prospects of PCBC as specified herein.

25      92.    Sandler O'Neill's primary liability arises from the following facts: (a) it

26  was a major analysts who issued reports and ratings relating to the Company during

27  the Class Period; (b) by virtue of its responsibilities and activities as an analyst firm

28  was privy to and participated in the creation, development and reporting of analyst

27

reports about the Company; (c) had access to members of the Company's management team, reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (d) was aware of the dissemination of information to the investing public, which it knew or recklessly disregarded was materially false and misleading.

93. Sandler O'Neill had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PCBC's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

94. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PCBC's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of PCBC's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired PCBC common stock during the Class Period at artificially high prices and were, by virtue of having purchased PCBC stock at inflated prices and

28

continuing to hold that stock as the market began to learn the truth and the inflation began to dissipate from the PCBC stock price, damaged thereby.

95. At the time of said material misrepresentations and omissions, plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of PCBC, which were not disclosed by defendants, plaintiff and the other members of the Class would not have purchased or otherwise acquired their PCBC common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

96. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

97. By virtue of the foregoing, the Sandler O'Neill has violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## THIRD CLAIM

### Violation of Section 20(a) of the Exchange Act

### Against the Individual Defendants

98. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99. The Individual Defendants acted as controlling persons of PCBC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's operations and the significant and material problems that the Company was experiencing as a direct result of its restructuring, the Individual Defendants had the power to influence and control and did influence and control, directly or

29

indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

101. As set forth above, PCBC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class, by virtue of having purchased PCBC stock at inflated prices and continuing to hold that stock as the market began to learn the truth and the inflation began to dissipate from the PCBC stock price, suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing conduct, in an amount to be proven at trial, including interest thereon;

1      (c)    Awarding plaintiff and the other members of the Class their reasonable

2              costs and expenses incurred in this action, including counsel fees and

3              expert fees; and

4      (d)    Such other and further relief as the Court may deem just and proper.

5                                    **JURY TRIAL DEMAND**

6              Plaintiff hereby demands a trial by jury.

7

8      Dated: October 13, 2009                   STULL, STULL & BRODY
                                                 Patrice L. Bishop
9                                                Timothy J. Burke

10

11                                       By:   _Patrice Bishop_____

12                                             Patrice L. Bishop
                                               10940 Wilshire Boulevard
                                               Suite 2300
13                                             Los Angeles, CA  90024
                                               Tel:   (310) 209-2468
14                                             Fax:   (310) 209-2087

15                                             **Counsel for Plaintiff**

16

17

18

19

20

21

22

23

24

25

26

27

28

31

## PLAINTIFF CERTIFICATION

THOMAS SHOTKE ("Plaintiff") hereby states that:

1.     Plaintiff has reviewed the complaint and has authorized the filing of the complaint on his/her behalf.

2.     Plaintiff did not purchase any securities of Pacific Capital Bancorp ("Pacific Capital" or the "Company") at the direction of his/her counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a lead plaintiff and/or representative party on behalf of a class, including providing testimony at deposition and trial if necessary.  Plaintiff understands that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Plaintiff Certification.  Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group.  A lead plaintiff is a representative party that acts on behalf of other class members in directing the litigation.

4.     All of Plaintiff's purchases and/or sales of Pacific Capital common stock which are the subject of the complaint are set forth on the separate page annexed as Appendix A to this document.

5.     Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws during the last three years unless otherwise stated in the space below:

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of a class except to receive his pro rata share of any recovery, or as ordered or approved by the court including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this ___10___ day of October 2009

_____
                                        Signature

## Appendix A

### Pacific Capital Bancorp Common Stock

| TRADE DATE | SECURITY/SYMBOL | QUANTITY | PRICE PER SHARE | PURCHASE / SALE |
|---|---|---|---|---|
| 5/12/09 | PCBC | 100 | 6.60 | Purchase |
| 5/14/09 | PCBC | 50 | 6.04 | Purchase |
| 5/19/09 | PCBC | 50 | 5.85 | Purchase |
| 5/20/09 | PCBC | 50 | 5.44 | Purchase |
| 5/21/09 | PCBC | 50 | 4.96 | Purchase |
| 5/27/09 | PCBC | 50 | 5.24 | Purchase |
| 5/27/09 | PCBC | 50 | 4.98 | Purchase |
| 6/02/09 | PCBC | 200 | 4.86 | Sale |
| 6/09/09 | PCBC | 200 | 4.64 | Sale |
| 6/23/09 | PCBC | 50 | 2.73 | Purchase |
| 6/23/09 | PCBC | 50 | 2.80 | Purchase |
| 7/01/09 | PCBC | 50 | 2.09 | Purchase |
| 7/06/09 | PCBC | 150 | 1.88 | Sale |
| 7/13/09 | PCBC | 100 | 2.22 | Purchase |
| 7/15/09 | PCBC | 200 | 2.36 | Purchase |
| 7/16/09 | PCBC | 100 | 2.69 | Purchase |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Please list additional transactions, if any, on a separate sheet of paper if necessary.

Patrice L. Bishop (SBN 182256)
Timothy J. Burke (SBN 181866)
STULL, STULL & BRODY
10940 Wilshire Boulevard, Suite 2300
Los Angeles, CA 90024
Tel: (310) 209-2468        Fax: (310) 209-2087

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS SHOTKE, Individually and on Behalf of all Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>PACIFIC CAPITAL BANCORP, GEORGE LEIS, DAVID PORTER, and SANDLER O'NEILL & PARTNERS L.P.,<br><br>DEFENDANT(S). | **CASE NUMBER**<br><br>CV09-7400 mAN<br><br><br><br>**SUMMONS** |

TO:   DEFENDANT(S):   PACIFIC CAPITAL BANCORP, GEORGE LEIS, DAVID PORTER, and SANDLER O'NEILL & PARTNERS L.P.,

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Patrice L. Bishop & Timothy J. Burke_, whose address is _STULL, STULL & BRODY, 10940 Wilshire Blvd., Suite 2300, Los Angeles, CA 90024_.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __1 3 OCT 2009__

By: _____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself □) | DEFENDANTS |
|---|---|
| THOMAS SHOTKE, Individually and on Behalf of all Others Similarly Situated | PACIFIC CAPITAL BANCORP, GEORGE LEIS, DAVID PORTER, and SANDLER O'NEILL & PARTNERS L.P. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| STULL, STULL & BRODY        Tel:  (310) 209-2468<br>10940 Wilshire Boulevard, Suite 2300<br>Los Angeles, CA  90024 | NIXON PEABODY LLP<br>One Embarcadero Center, 18th Floor<br>San Francisco, CA 94111-3600<br>Tel: (415) 984-8200    ORRICK HERRINGTON & SUTCLIFF LLP<br>777 South Figueroa Street, Suite 3200<br>Los Angeles, CA 90017-5855<br>Tel: (213) 629-2020 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- □ 1 U.S. Government Plaintiff
- ☑ 3 Federal Question (U.S. Government Not a Party)
- □ 2 U.S. Government Defendant
- □ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | □ 1 | Incorporated or Principal Place of Business in this State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV. ORIGIN** (Place an X in one box only.)

- ☑ 1 Original Proceeding
- □ 2 Removed from State Court
- □ 3 Remanded from Appellate Court
- □ 4 Reinstated or Reopened
- □ 5 Transferred from another district (specify):
- □ 6 Multi-District Litigation
- □ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:**   JURY DEMAND: ☑ Yes   □ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes   □ No    ☑ MONEY DEMANDED IN COMPLAINT: $ Unknown at this time

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, and is filed under Rule 23 F.R.C.P. as a class action and under the Private Securities Litigation Reform Act of 1995.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER<br>PETITIONS | LABOR |
|---|---|---|---|---|---|
| □ 400 State Reapportionment | □ 110 Insurance | □ 310 Airplane | □ 370 Other Fraud | □ 510 Motions to Vacate Sentence Habeas Corpus | □ 710 Fair Labor Standards Act |
| □ 410 Antitrust | □ 120 Marine | □ 315 Airplane Product Liability | □ 371 Truth in Lending | | □ 720 Labor/Mgmt. Relations |
| □ 430 Banks and Banking | □ 130 Miller Act | □ 320 Assault, Libel & Slander | □ 380 Other Personal Property Damage | □ 530 General | □ 730 Labor/Mgmt. Reporting & Disclosure Act |
| □ 450 Commerce/ICC Rates/etc. | □ 140 Negotiable Instrument | □ 330 Fed. Employers' Liability | □ 385 Property Damage Product Liability | □ 535 Death Penalty | |
| □ 460 Deportation | □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 340 Marine | BANKRUPTCY | □ 540 Mandamus/Other | □ 740 Railway Labor Act |
| □ 470 Racketeer Influenced and Corrupt Organizations | | □ 345 Marine Product Liability | □ 422 Appeal 28 USC 158 | □ 550 Civil Rights | □ 790 Other Labor Litigation |
| □ 480 Consumer Credit | □ 151 Medicare Act | □ 350 Motor Vehicle | □ 423 Withdrawal 28 USC 157 | □ 555 Prison Condition | □ 791 Empl. Ret. Inc. Security Act |
| □ 490 Cable/Sat TV | □ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | □ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| □ 810 Selective Service | | □ 360 Other Personal Injury | □ 441 Voting | □ 610 Agriculture | □ 820 Copyrights |
| ☑ 850 Securities/Commodities/ Exchange | □ 153 Recovery of Overpayment of Veteran's Benefits | □ 362 Personal Injury-Med Malpractice | □ 442 Employment | □ 620 Other Food & Drug | □ 830 Patent |
| □ 875 Customer Challenge 12 USC 3410 | □ 160 Stockholders' Suits | □ 365 Personal Injury-Product Liability | □ 443 Housing/Acco-mmodations | □ 625 Drug Related Seizure of Property 21 USC 881 | □ 840 Trademark |
| □ 890 Other Statutory Actions | □ 190 Other Contract | □ 368 Asbestos Personal Injury Product Liability | □ 444 Welfare | □ 630 Liquor Laws | SOCIAL SECURITY |
| □ 891 Agricultural Act | □ 195 Contract Product Liability | | □ 445 American with Disabilities - Employment | □ 640 R.R. & Truck | □ 861 HIA (1395ff) |
| □ 892 Economic Stabilization Act | □ 196 Franchise | REAL PROPERTY | □ 446 American with Disabilities - Other | □ 650 Airline Regs | □ 862 Black Lung (923) |
| □ 893 Environmental Matters | □ 210 Land Condemnation | | IMMIGRATION | □ 660 Occupational Safety /Health | □ 863 DIWC/DIWW (405(g)) |
| □ 894 Energy Allocation Act | □ 220 Foreclosure | □ 440 Other Civil Rights | □ 462 Naturalization Application | □ 690 Other | □ 864 SSID Title XVI |
| □ 895 Freedom of Info. Act | □ 230 Rent Lease & Ejectment | | □ 463 Habeas Corpus-Alien Detainee | | □ 865 RSI (405(g)) |
| □ 900 Appeal of Fee Determination Under Equal Access to Justice | □ 240 Torts to Land | | □ 465 Other Immigration Actions | | FEDERAL TAX SUITS |
| □ 950 Constitutionality of State Statutes | □ 245 Tort Product Liability | | | | □ 870 Taxes (U.S. Plaintiff or Defendant) |
| | □ 290 All Other Real Property | | | | □ 871 IRS-Third Party 26 USC 7609 |

CV09-7400

FOR OFFICE USE ONLY:   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑Yes
If yes, list case number(s): __CV09-06501 RGK (PLAx)_____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☑A. Arise from the same or closely related transactions, happenings, or events; or
  ☑B. Call for determination of the same or substantially related or similar questions of law and fact; or
  ☑C. For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐D. Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Plaintiff Thomas Shotke resides in Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Pacific Capital Bancorp, George Leis, and David Porter - County of Santa Barbara | Sandler O'Neill & Partners L.P. - state of New York |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| All claims arose in the county of Santa Barbara | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _[signature]_     Date   October 13, 2009

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |